The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this honorable court are admonished to draw near and give their attention as the court is now sitting. God save the United States and this Good afternoon, ladies and gentlemen. We are ready to hear oral argument in the case of Elim Romanian Pentecostal Chur against Pritzker. Mr. Meehan. Good afternoon, your honors. Horatio Meehan for the appellant. I would reserve six of my 20 minutes for rebuttal, please. May it please the court, this court should reverse the district court's denial of a preliminary injunction because this disparate 10-person limit on worship services is subject to strict scrutiny and cannot overcome it. Now, this appeal is not moot for two reasons. Number one, the governor has left himself complete and total discretion to return to the old policy. And number two, the dispute is one that is capable of... Hello? Hello? Laurie? And number two, because this dispute is capable of repetition and yet evading review. Taking them in turn, number one, the governor has not disclaimed his intent to return to the old policy and the governor has not disavowed the legality of his policy. On the contrary, he is vigorously defending it before this court, before the lower court, and also at the Supreme Court. Now, the most that the governor can say is that it is speculation for us to surmise what he will do next and what it is that he won't tell us. However, that shifts the burden to the appellants when, in fact, the Supreme Court said in Already v. Nike that it is the governor who has a burden and it's a formidable burden of making it absolutely clear that he will not return to the allegedly wrongful conduct. The governor has not done that here. He has not submitted an affidavit disclaiming any intent to return to the policy. He has not said that he has seen the error of his ways and will not return. In fact... Yes, Your Honor? Judge Hamilton, if we were to agree with you on the merits and agree that this is not moot, what do you think an injunction should actually say that would issue now? The injunction would enjoin the governor from enforcing Order 32 either now or in any eventual reiteration or resurfacing of that order. So it would prohibit the governor from employing any measures that treat the What I'd say is, in Trinity Lutheran, the Supreme Court said that the matter was not moot because there is no clearly effective barrier that would prevent the department from reinstating its policy. Well, that same thing is true here. There's no barrier for the governor to return back to the policy. And, in fact, if you look at the governor's Executive Order 38, which was the most recent one passed on May 29, the one that announced the change in policy, the wherewith clauses in the first two pages of that order are chock-full of dire, dire warnings that indicate that the governor is still very concerned about the situation. Still, he says that the situation is such that the health care resources are taxed, are overtaxed, and even the peak of this virus has not happened yet, according to the governor. And so, for all of those reasons, it remains likely that the governor can and will return back to the policy. And I would also be remiss if I didn't point out that the timing of the policy change is very suspect because this policy change was announced mere hours before the governor was called to give an account at the Supreme Court before Supreme Court Justice Kavanaugh. And the only change that took place is to relieve the churches, and only the churches, of the 10-person limit. Everybody else that didn't challenge the policy, and everyone else whose restriction the governor did not have to justify at the Supreme Court, was not relieved of that restriction. Now, in the governor's five-phase plan, it was not until phase five that the restrictions were supposed to go away, and the governor said that was going to take place 12 to 18 months down the road. In fact, he said there would be one of three conditions would have to happen. Either a vaccine would be developed, or a therapeutic treatment would be developed, or there will be no new cases for a significant period of time. You can see that on the last page of Exhibit C in appendix number two. Well, indisputably, none of those conditions took place or happened by May 29 when the governor issued this new order. And so, for those reasons, there's no doubt here that the governor hasn't had a change of heart. This is just a litigation-driven change of policy, maintaining complete and total discretion to return back. The dispute is capable of repetition, yet evading review. In our motion to dismiss opposition, we have on page five a chart that traces the various iterations of these orders and shows that the average lifespan is less than 30 days. Some iterations were only in effect for 10 days. And on page 15, 16 rather, of our opposition, we have four Supreme Court cases. Two of them say that two years is too short, one says 18 months is too short, and one says one year is too short. If that is the case, then 30 days or 10 days is definitely too short for a dispute to be fully played out. And the last thing I'll say about this is the governor only cites to the Supreme Court case of Kern, which is on page 17 of its brief on this capable of repetition issue. Kern was based on the premise from the Supreme Court where the Supreme Court says, quote, defendant's good faith representation that they had no intention of returning to the old policy might have properly led to the denial of injunctive relief, end quote. We do not have any such representation here from the governor for all of these reasons. This case is not moot and this court should reach the merits. And so moving to the merits, in our briefs we explain several reasons why we get to strict scrutiny in this case. I will focus on the free exercise path right now. And in Lukumi, the Supreme Court held that a law falls well below the minimum standard necessary to protect First Amendment rights when it fails. Yes, Your Honor. If we were to get to strict scrutiny, you've conceded the compelling state interest, I believe. And I guess my question is, how should courts, as you see it, enforce the requirements that restrictions be narrowly tailored and the least restrictive means available? In the case of an infectious disease pandemic, are they required to first try less restrictive measures and wait and see if they fail? Are they required to try the, in our federal system, the least restrictive governor's approach so that we kind of go with the lowest common denominator as a matter of constitutional mandate? Under the Supreme Court's teaching of McCulloch and then also the Bruni case out of the Third and determine that they do not work, or if the other alternative, if the exigencies are such that that cannot be done, what the governor would have to do is, quote, seriously consider other alternatives and make out a compelling case as to why they would not work. And so either you try them or if you cannot try them, you have to show in the record that you actually seriously considered them and found them wanting for good reason. It's not enough to simply say that you consider them. It's not enough to simply say that they would not work. You have to have compelling evidence that you have a compelling justification to treat religious exercise disparately. And let me say something, and this is what makes this particular Order 32 so offensive from a constitutional standpoint. This particular order doesn't just exempt 23 other categories of businesses from the 10-person requirement, but if you look on page 8 of Executive Order 32, this is section... Counsel? Yes, Judge. This is Judge Easterbrook. The argument you're now making, like much of your brief, supposes that there is discrimination against religion, which is what you contend takes this case outside the scope of Smith. I wonder whether it's proper to suppose that as opposed to argue it. If you look at the case, the California case, when it got to the Supreme Court, the dispute between the Chief Justice and the dissenting opinions dealt with what the right comparison group was to find out whether there was religion. The Chief Justice thought the right comparison group was something like concerts or movies, and the dissent thought the right comparison group was something like grocery stores. It seems to me we need to start there. Why is it that you think the right comparison group is grocery stores or law offices? For two reasons, Your Honor. Number one, even grocery stores and warehouses, they will have dozens and sometimes hundreds of employees working together for eight hours, ten hours, or more per day. Without any limitation, they would be able to have employee meetings. So it's incorrect to simply look at the shopper, and I wouldn't even accept the premise that all shoppers only go inside Walmart for ten minutes. I think that several of them could spend a lot more time. There's certainly no legal requirement that they only go in for a certain amount of time, but the employees are there for hours and hours of time. There is no restriction upon them in terms of having employee meetings, in terms of interacting with customers, touching the same products, the same credit cards, the same cash. In all of those respects, these places are actually more dangerous than a properly distanced church service where people are six feet apart and where things have been properly sanitized. The basic error that is being made in these comparisons is that it seems like some people are willing to assume that that folks will change their behavior at Walmart, but then at church they'll continue to do what they've always done before this virus, which is to have close meetings, or to have handshaking, or hugging, or all those other things, when in fact people at church are the same people that go to Walmart and they can adjust their conduct at church too. But the other point that I really want to make, which is really, really important here, and it makes this case very different from what Chief Justice Roberts was commenting upon in California. Here, if you look on page 8 of Executive Order 32, this is Section 2.12 Subsection C. What this Executive Order does is it removes the 10-person limit on churches when they are engaged in non-religious activity, such as, for housing the homeless overnight. So under this order, a church could have 500 people in its auditorium and feed them a meal, or house them overnight, and under the Subsection C, they have no numerical limit. But as soon as that gathering turns into a worship service, a religious service, then they are no longer considered engaging in a protected activity. The 10-person limit kicks in, and now you have a criminal punishment that's a subject. If that's not a content-based restriction, if that's not a discriminatory provision that punishes churches only when they engaged in religious conduct, you know, the virus doesn't know why the people are there for, then I can't imagine what else would suffice. And I would estimate that Chief Justice Roberts did not have that kind of an opinion before him. The other thing I'd say about the California case, Chief Justice Roberts there and the whole court, they were very concerned with the exceedingly high burden that you have when you approach the court on an emergency motion such as was the case there. Here, before your honors, we're on a traditional interlocutory appeal where the plaintiff's burden is merely to show a more-than-negligible chance of success on the merits. I submit to you that there is no way in our Constitution, under our Constitution, that this subsection C, that this order that discriminates against only religious use of church property in such a profound manner can survive. And I see that my time is up. I'm happy to continue if the court will allow or stop here. Counsel, your time isn't up. Oh, I'm sorry. I'm sorry. I thought that my time was up, but I'm happy to, yeah, just to save the rest of my time for rebuttal. Certainly, Counsel. Ms. Gupta. Good afternoon, and may it please the court, Assistant Attorney General Priyansh Devgopalas or Defendant Atlee Governor Pritzker. I'd like to first start by talking about why this appeal is moot and begin by clarifying the Voluntary Substation Standard. The standard there is that we need to show that it is clear that there could not be a reasonable expectation of this type of restriction being imposed on the future. The standard does not require the government to disavow any conduct that they've taken in the past or make clear that they will never take it again in the future. In Federation advertising, this court explained that it does not presume bad faith on behalf of the government, so when there has been a voluntary cessation of activity by the the reasons for stopping the activity were genuine and therefore cannot reasonably be expected to reoccur, and here we have made that showing for at least four reasons. The first is that the governor's decision to lift the restrictions in EO 38 on religious gatherings were tied to the data and the situation in Illinois. The order explains that the inspection rate... Counsel, this is Judge Easterbrook. That's exactly what worries me. The governor's decision, he said, was tied to the current situation. If cases of coronavirus spike in Illinois, is there anything to prevent the governor from changing courts? Your Honor, there is not, but there are reasons to believe that this level of restriction wouldn't be necessary even if we were hit with a second wave, and that's because we already know a lot more about this virus. I'm not worried about what's necessary or what the governor is likely to conclude. If I understand the Supreme Court's test, it's something like whether it is absolutely clear that the alleged wrongful behavior could not reasonably be expected to occur. I wonder how it is absolutely clear that it can't recur if the governor is reserving his right to change the rule when the data change. Well, Your Honor, I think Federation Advertising is helpful again here because there the city of Chicago had repealed the challenge ordinance while litigation was ongoing and had proposed a new one, and this court found that that proposal was not enough to show that there was a reasonable expectation of the conduct reoccurring for two reasons. The first is that the ordinance seems different, and second, it was simply a proposal, and there the city had not disavowed its previous repealed order. So here the governor has not even proposed that he will impose such a restriction on religious gatherings, nor has he said that he would treat religious gatherings different from the secular gatherings that face this challenge. We have too many unknown variables right now, so the mere possibility that this type of restriction might be necessary on religious gatherings and that it might operate in the same way with regards to secular gatherings is not enough to show a reasonable expectation, and so that's why we've made it absolutely clear, because the governor's actions have always been tied to scientific... I wish you would deal with this in the Supreme Court's terms. It is not the plaintiff's burden to show a reasonable expectation of anything. It is the defendant's burden, the Supreme Court says, to make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur, and I wish you would address that standard, which is the Supreme Court standard. Your Honor, we've made it absolutely clear that this because the governor's actions have always been tied to medical research, and now we know a lot more about the virus. For example, we know that it doesn't transmit as easily outdoors or even indoors, or if the window is open or there is more ventilation, and as we've learned more about the virus, the governor has... So you say we now know enough about the virus, so is the current order? No, Your Honor, we are not... Well, if, as you say, we now know enough about the virus to be sure, why won't the governor make such a commitment? Because, Your Honor, this virus has been so unprecedented that even though we know more about the virus, there's still a lot more for us to learn. So if the governor were to make such a declaration, which, I can point out, was not required by the Supreme Court standard, then the possibility is still out there, even though it's hypothetical that a new strain of this virus could come by in Illinois and more restrictions would be necessary. But even if this court finds that the voluntary cessation exception applies here and would like to go to the merits of this case, we still think that a preliminary injunction is not necessary here. And that's first because the Jacobson framework applies here. This is an emergent situation, the likes of which the world has not seen before, and the governor... Counsel, I want to ask you the same question that I asked your adversary, which is, how do we determine the right comparison group? If we're trying to apply the Smith standard and look for a neutrality in treatment between religion and non-religion, what is the right comparison group? The Chief Justice and dissenting justices in the California case took very different views about that, and the plaintiff's lawyer just invoked warehouses where people congregate for long periods. I'd like you to explain why, in your view, that's not a good comparison group. Your Honor, I don't think it's a good comparison group because even though it's possible that, for example, as my personal counsel pointed out, employees might work for more than an hour for a long time at a place like Walmart, you do not go to these stores to stand together in groups for hours at a time. For example, people who work at cash registers go to their separate stations, which are spaced apart. People who are tasked with restocking an aisle go in, complete that space. So the intention of working in these stores is not to stand together for long periods of time. There are, of course, risks with working at a grocery store or at a warehouse, just like there are risks with conducting almost any other activity currently. But EO 32 was tailored to those risks. For example, it recognized that people stand in manufacturing plants, but it asked manufacturing plants to limit the amount of wines that they operate in staggered among other things so that people will not be grouped together for long periods of time. Similarly, grocery stores are supposed to have one-way aisles so people aren't passing each other, and employees are supposed to engage in social distancing and wear masks when they cannot do so. So EO 32 does recognize that there are some risks at working at these stores, but simply that the activity is different. And that's why Chief Justice's reasoning is useful here, because the test from Lacrimi is to compare secular conduct that endangers the government's interests in the same way. Here, meeting for a lecture in a school or for a concert or a movie theater is more similar to the type of activity that religious worship entails. It involves standing together in a group. Excuse me, Ms. Gupta, this is Judge Hamilton. If Order 32 is so well tailored, why does the worship restriction apply the same, a cap of 10 people, whether we're talking about a cathedral with room for a thousand or a storefront with room for 30? Your Honor, that limit was consistent with guidance from the CDC at the time about how big gatherings should be, and no matter how big a cathedral might be, a gathering of 50 people is necessarily more dangerous than 10 people. So because at the time the virus was spreading so rapidly, Illinois, and the national guidance was to limit gatherings, it seemed appropriate to limit gatherings to 10 people. Now that the situation has increased in Illinois, this restriction has been limited. And because of this, the governor's actions pass the deferential framework set out in Jacobson. This is the type of case to which that framework would apply, and it has two prongs. The first is that the government action be rooted in a substantial public health interest, which is, of course, present here where the governor was attempting to curb the spread of COVID-19. And the second is that the government's action does not go beyond, it does not, beyond all question, constitute a palpable invasion of constitutional rights. We understand that it is very important. Council, excuse me, but could you address Plater's point made a few minutes ago about the, for example, social services being provided by churches in the same buildings when you're feeding the homeless, feeding the hungry, housing the homeless, and so on. Yes, Your Honor, we think that this exemption actually shows that the governor was not discriminating against religion. For many organizations, whether secular or religious, providing these types of charitable services is central to their mission or their religion. But these types of activities can be provided without extended verbal interaction in close quarters. Someone can be let in to stay somewhere in the church without that person in the past year being grouped together for long periods of time. The church can leave food out on tables for people to take without standing together in rooms for long periods of time. So the governor was trying to allow whatever activity he could given the information we had about the virus at the time. And so he recognized that many religious organizations find it essential to provide such services. And recognizing that this activity was different than standing together, for example, as a lecturer at a school, allowed these organizations to continue to conduct such activity in a safe manner. So we don't think this exemption actually shows religious animus, but rather shows that the governor was cognizant of the type of activities that religious organizations engage in, and he tried to commit them when it was safe to do so. And so I think this is Judge Hamilton. Another question I want to put out there for you to address. We know that I assume that in those palpable violations in the Constitution, we would find, for example, an order that decided to shut down one faith's worship services and not another's, or one party's rallies and not one religious organization's. I'm not sure why in the pandemic context, concerns about discrimination and pretext. As you, we see, for example, around the country, the exercise of some constitutional rights is more controversial than others. It's pretty hard to find animus against religion in and want to, for example, impose greater restrictions on access to firearms or greater restrictions on access to abortion services. Your Honor. So I think that how do we go about distinguishing between discriminatory or pretextual features of some of these orders and and legitimate deference? Your Honor, I think there are a few ways to determine whether the government's actions are pretextual. The first is to look at what the medical experts are recommending, and even the CDC is recommending limiting in person worship gatherings and limiting gatherings in general. Another way is to look at how the order is treating other conducts. This is similar to the Smith analysis, but I think it is helpful to look at the context in which the order is issued. So if, for example, the governor was prohibiting prohibiting religious exercise, but was allowing large funerals to occur, as was the case in the North Carolina case for Ian Baptist, that could suggest some type of pretext where the gatherings are functionally similar, but one was being allowed, but the other. But here we don't have any evidence of pretext. If we look at the events leading up to the issuance of EO 32, we were in the beginning months of the pandemic. And what we did know is that it was spreading quickly in gatherings, and it spread quickly from people speaking and singing. So given that information at the time there, there was no evidence that there was pretext. Rather, there was evidence of the governor's orders of confidence with including that from the CDC. I have, I have to follow up by asking about marches and demonstrations and how those compare. Of course, Your Honor, there are, of course, risks in marching or in protesting and large groups. And those types of things are occurring now. But at the same time, there aren't any restrictions on religious gatherings. So the governor has made a permissive policy choice, given that the situation in Illinois has been steadily increasing to allow these activities that implement First Amendment concerns, and especially because these protests and marches are occurring outside where the virus doesn't transmit as easily. He's also made the permissive policy choice to ease restrictions on businesses right now because many Illinois residents and businesses have suffered financial damage. So what he's trying to do is, is to balance the safety of Illinois residents, but also recognize that people need to resume their normal activity. And an important category of that activity is First Amendment liberty, such as religious exercise. And we think there's no question that this type of deference was due when EO 32 was entered. We're not trying to suggest that as long as COVID-19 exists in the world, that there will continue to be this need for deference to every government action. But simply when you look at when EO 32 was entered, the situation was so dire in Illinois, and people were dying so rapidly that this type of deference was needed, and we believe easily met. But even if this court were to go to the Smith Council, this is Judge Keeney. You talk about the what the record shows and how many deaths were there and churches, do you know? Go ahead. I'm sorry, I unfortunately do not have the information of how many deaths were due to churches. But there were accounts that were going on that these types of gatherings caused outbreaks of the virus. Well, these type of gatherings doesn't exactly answer the question. The and also there's not universal. We speak as if there is a universal findings with regard to the medical evidence in this thing. I don't think that's the case, is it? Your Honor, it is correct that there's a lot that we don't know about this virus. And there's a lot of dispute about it. But what is undisputed is that it travels primarily through respiratory transmission. So when someone speaks or sings, these droplets can be transmitted. And what I meant about these types of gatherings is that there are numerous accounts throughout the world of religious gatherings leading to outbreaks. And we have to keep in mind the context of when this order was entered at the end of April. This wasn't a situation where the governor had a lot of time to compile years of research and figure out what was going on. We had to act in accordance with the knowledge that we had at the time. And that knowledge showed that in-person gatherings that center around verbal interaction are dangerous. And that's why schools have been closed. No one doubts that going to school is very important, but they have been closed for the past few months and have only right now been opened for summer school on a short term basis. And other activities such as going to a movie theater or a restaurant, which I found comparable, are still prohibited. So looking at the broader context, there's no evidence of religious animus. Instead, there is an effort to look at... Counsel, you have two minutes remaining. Thank you, Your Honor. I would like to know whether I addressed any... I do have a question, though. Would you be willing to agree and say that you will not enforce or go back to the original order without coming to this court to seek permission? Your Honor, we are not willing to do that at this time. But I would like to point out that neither the governor nor the state has taken any enforcement measures against the church. The enforcement measures the plaintiffs have faced have been from local governments, which have hormonal authority and can take measures more strict than the governor does. So, so far, the governor has not taken any enforcement actions against plaintiffs or churches or any places of worship. But I would like to point out that no matter what happens in the future, the context is going to be important because we'd have to look at not only what restriction was placed on churches, but also on other secular gatherings and how they operate together. So we do understand if this court thinks that there is a wise case here, we still think that there is no evidence of religious animus under Locuni or Smith for the reasons that I outlined. And we think that the South Bay case is still useful here because even though the standard is different there, Chief Justice Roberts' opinion emphasized the need for publicly elected officials in this context. And the governor has thus taken steps to protect the people of Illinois, and they will continue to rely on this publicly elected official to protect them from a virus that has already taken the lives of more than 6,000 individuals. So I know that I'm almost out of time, and unless the court has any further questions, I ask this court to deny this request for preliminary injunction. Thank you, counsel. Mr. May, anything further? You have about four and a half minutes. Yes, I have several quick hits here, Your Honors. Number one, when discussing the difference between warehouses and churches, my colleague on the other side said that the intention of the people going to these places is different. With due respect, the virus doesn't care what the intention of the people is. What matters is the proximity of the people, and there is no reason why people cannot be distanced in a church like it would be anywhere else. Counsel mentioned that some of these warehouses have different doors for egress and ingress, or one-way aisles going in and out, or various measures that they have taken. Well, the churches can and have taken the same exact measures, and so there's no reason why we would not even give the churches a chance to try to implement the same measures. That's all the churches are discriminates against the religious use of the church property. You know, the section 2.12c says, businesses and religious and secular nonprofit organizations, including food banks, when they are providing food, shelter, social services, and other necessities of life for needy people, are exempt from the 10 person requirement. So counsel said that, you know, these things can be done without close interaction, but you know, a church could literally have 500 people in its auditorium feeding them a meal, or housing them overnight, or teaching them how to submit a jobless benefits application, and it would not have any of those limits to contend with. But as soon as the church starts preaching, or praying, or worshiping with the same people in the same auditorium, this With respect to the protests and whatnot that are happening, you know, everybody else other than churches continues to remain subject to the 10 person limit that was beforehand, except that now the governor has decided to make exceptions for other people. This shows the arbitrary nature of these provisions that the governor can just decide to impose and give exemptions to whomever he wants, without anything to cabin his discretion. I do want to spend a little bit of time on enforcement. You know, every enforcement action that was taken against these churches, from the citations that they have received, the criminal citations, right over to the letter that threatens to actually bulldoze the churches, all of them have referenced the governor's orders, specifically saying that the enforcement action is being taken because of the governor's orders. And so what I would say then, with respect to the movement issue, the federation advertising case is different, because in that case they were dealing with a legislative enactment, not with a governor that was ruling by fiat. And so when a legislature enacts something and then repeals it, it is entitled to more deference than when one single person gets to make these decisions willy-nilly, without any kind of things to cabin their discretion. I would say that it's very clear that Jacobson does not stand for the proposition that there's a pandemic exception to the Constitution, and I would say that the chief justice in the California opinion, he was alone, not even the four other justices in the majority joined that concurrence. And I would end this presentation by asking the court to again spend some time with the first two pages of Order 38. This is the new, the brand new order that was issued on May 29th. There are so many dire predictions in these whereas clauses about where the state is now, that there's nothing in here that would support the governor's claim that things all of a sudden have gotten better, and Yes? I'm sorry? I think they weren't asking. Oh, go ahead. And so there's nothing in this order that would suggest that the restriction on churches was removed because the situation has gotten better for churches and only for churches. And what this also shows is that... I'm sorry? Thank you, counsel. Oh, time is up. Okay, I'm sorry, I didn't hear. Thank you very much to both sides. The case is taken under advisement and the court will be in recess. Thank you.